In the

# United States Court of Appeals
## For the Seventh Circuit

No. 19-3242

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

EMMANUEL L. HART,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:17-cr-00171(1) — **Jorge L. Alonso**, *Judge*.

ARGUED MARCH 2, 2021 — DECIDED APRIL 27, 2021

Before RIPPLE, HAMILTON, and KIRSCH, *Circuit Judges*.

KIRSCH, *Circuit Judge*. Emmanuel Hart was convicted by a jury of robbing two Chicago banks in violation of 18 U.S.C. § 2113(a). On appeal, he argues that the district court erred when it precluded him from recalling two government witnesses during his case-in-chief. Finding no error, we affirm.

I

Emmanuel Hart was charged in a two-count indictment
with robbing a branch of the Fifth Third Bank on April 29,
2016, and a branch of the First American Bank on March 20,
2017. The modus operandi of each robbery was similar. A
man entered the bank and handed a teller a note that de-
manded stacks of $100 bills without tracking devices and
warned that the robber had "full-blown AIDS" and nothing
to lose. After the teller handed the man some cash, the man
exited the bank leaving the note behind and boarded a nearby
train to leave the scene of the crime. But the robberies differed
in one important respect: The Fifth Third teller heeded the
robber's demand and did not include a tracking device, but
the First American teller slipped such a device among the
stacks of cash.

Shortly after the First American robbery, the tracking de-
vice was activated, eventually leading law enforcement to
Hart. To explain how the tracking device investigation pro-
ceeded, the government called Chicago Police Detective Jason
Motyka and FBI Special Agents Michael Lovernick and Ward
Yoder. Agents Lovernick and Yoder testified that they re-
ceived text notifications relaying, in real time, the direction
that the tracking device was traveling—first south, then west,
and finally south again before stopping near the intersection
of 63rd and Halsted Streets. Based on this pattern, they testi-
fied that the tracking device likely traveled south on the "L"
train's Red Line, and then west and south on buses. Accord-
ingly, law enforcement officers stopped several buses near the
intersection of 63rd and Halsted Streets, including what the
parties refer to as the 63rd Street bus and the No. 8 bus. At the
intersection, Agent Yoder used a handheld device to pinpoint

the tracking device's location. The tracking device pointed to the No. 8 bus, which Detective Motyka and Agent Lovernick then boarded. Using a surveillance photo from the First American Bank robbery, the pair identified Hart by his silver wristwatch and resemblance to the suspect in the photo. Both also noticed that Hart's pockets were bulging. Detective Motyka and Agent Lovernick removed Hart from the bus, searched his pockets, found cash and the tracking device, and arrested him.

Along with the tracking device investigation, the government introduced a variety of other evidence connecting Hart with both robberies. For example, the government presented surveillance videos of Hart riding a southbound Red Line train that were consistent with the tracking device's movement as it left First American Bank. And the government introduced public-transit records of cards registered to Hart that were used on the dates and around the time of both robberies. Additionally, a fingerprint expert testified that fingerprints on both demand notes left at the banks matched Hart's.

Hart represented himself at trial and focused his defense on two arguments. First, the mere fact that law enforcement found Hart with the cash and tracking device on the No. 8 bus did not necessarily prove that he robbed the First American Bank. He could have come upon the cash and the tracking device another way. Second, he boarded two buses on March 20—first the 63rd Street bus and then the No. 8 bus[1]—but law enforcement did not identify him on the 63rd Street bus when the bus was stopped at the intersection of 63rd and Halsted Streets. Hart did not connect his arguments at trial, but, as

---

[1] The government stipulated that Hart was, in fact, on both buses.

discussed below, now attempts to do so on appeal by arguing that law enforcement was unable to identify him when he was on the 63rd Street bus because he was not yet in possession of the cash with the tracking device.

To develop his second argument—that law enforcement did not identify him when he was on the 63rd Street bus— Hart cross-examined Detective Motyka, Agent Yoder, and Agent Lovernick about their search for the robbery suspect. Hart questioned them about their investigative activities, the timeline of those activities, the methods used to pinpoint the tracking device's location, and the process used to identify him on the No. 8 bus. Hart also asked each officer how many buses they had searched and whether they had seen Hart on any other bus. Detective Motyka testified that, in addition to the No. 8 bus, he "briefly boarded" the 63rd Street bus but did not "recall" seeing Hart on that bus. Agent Yoder stated that he only boarded one bus, the No. 8. Initially, Agent Lovernick testified that while he did not board the 63rd Street bus, several other law enforcement personnel did, including Detective Motyka and Agent Yoder. Moments later, however, after Hart repeated his questions, Agent Lovernick said that he "misunderstood" Hart's initial question and that he did not know who boarded the 63rd Street bus. From this testimony, Hart established that Detective Motyka briefly boarded the 63rd Street bus and that Agent Lovernick did not. Further, there is no evidence, other than Agent Lovernick's initial testimony based on a misunderstood question, that Agent Yoder was ever on the 63rd Street bus (which Agent Yoder denied).

After cross-examination and just before the government rested, Hart asked for a three-day continuance and to recall eight government witnesses for his defense, none of whom he

had subpoenaed. Among the eight were Agent Lovernick, Detective Motyka, and Agent Yoder. What followed was an extensive discussion between the district judge, Hart, and the government prosecutor, addressing one by one each witness and Hart's reasons for recalling them. Over the government's objection, the district court allowed Hart to recall Agent Lovernick, but not without hesitation. The district court told Hart that, when questioning Agent Lovernick, he would pay attention to whether Hart was "just trying to delay things." The district court also warned Hart that he would sustain an objection to Hart's question if Hart simply parroted his questions from cross-examination.

The district court denied Hart's request to recall Agent Yoder. During the discussion with the court, Hart explained that he wanted to ask Agent Yoder about whether he boarded the 63rd Street bus and when he boarded the No. 8 bus, hoping to impeach the timeline Agent Yoder established on direct examination. The government argued in opposition that the answers to Hart's questions were already in evidence and that Agent Yoder had answered the questions. In denying Hart's request, the district judge explained that: (1) it had allowed Hart's cross-examination to go "well beyond" the scope of direct; (2) "all" of the evidence Hart sought to elicit "came out" on direct; (3) "other evidence" was in the record from which Hart could argue to fully support his theory; and (4) Hart was "trying to delay things."

As for Detective Motyka, the district court initially granted Hart's request and asked the government to attempt to recall Detective Motyka, who was out of state. Hart was hoping to show that Detective Motyka's testimony—that he did not see Hart on the 63rd Street bus—was not true. More specifically,

Hart wanted to explore how Detective Motyka "could . . . not see" Hart on the bus if Hart had the tracking device on that bus and looked like the identification photo Detective Motyka had on his phone. When initially granting Hart's request, the district court limited questioning to that issue alone. After a break, however, and a renewed government objection to recalling Detective Motyka, the district court denied Hart's request to recall Detective Motyka. The district court reasoned that Hart had not subpoenaed any witnesses for his defense, and that each of Hart's questions was repetitive and concerned testimony that was "already in evidence" from Hart's cross-examination of Detective Motyka.

## II

Hart appeals the district court's denial of his requests to recall Detective Motyka and Agent Yoder. On appeal, Hart introduces what appears to be a variation of his defense theory at trial: Hart asserts that law enforcement did not apprehend him when he was on the 63rd Street bus because he was not yet in possession of the stolen cash with the tracking device; rather, he found the cash after exiting the 63rd Street bus but before boarding the No. 8 bus.[2] We are skeptical that Hart

---

[2] Hart's theory sidesteps important details. Detective Motyka testified that law enforcement stopped several buses at the intersection. He also testified that the 63rd Street bus was stopped when he boarded. Thus, under Hart's theory, the timeline is as follows: Hart was on the 63rd Street bus without the cash and tracking device when law enforcement stopped the bus; Detective Motyka then boarded the bus, but did not see Hart; Hart then exited the 63rd Street bus, found the cash and tracking device, and then boarded the No. 8 bus; and this sequence occurred all while law enforcement officers were actively searching for the location of the tracking device.

pressed this theory at trial. During oral argument, Hart pointed to three pages of the multi-day trial transcript that he says supports his theory. From Hart's few comments on the transcript pages he referenced, several logical leaps are required to arrive at his theory on appeal. But we will assume that Hart said enough to properly present the issue now.

Armed with this theory, Hart challenges the district court's rulings limiting his ability to recall Detective Motyka and Agent Yoder for further cross-examination. Hart argues that the district judge's ruling violated his Sixth Amendment rights to confront witnesses and to obtain witnesses in his favor. The government urges that Hart did not raise a Sixth Amendment argument at trial and, as a result, any argument on appeal is forfeited.

To preserve an appellate issue, a criminal defendant "must make a timely and specific objection in the district court." *United States v. Hathaway*, 882 F.3d 638, 640 (7th Cir. 2018) (quotation omitted). This ensures that both the court and the government are aware "of the potential error and the ground for objection." *United States v. Burns*, 843 F.3d 679, 685 (7th Cir. 2016). But it is also true that, generally, courts require less of *pro se* defendants than licensed lawyers. *See, e.g., Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *United States v. Clark*, 774 F.3d 1108, 1114 (7th Cir. 2014) (finding *pro se* defendant preserved a Rule 404(b) evidentiary argument when his pretrial brief generally objected to the government's 404(b) motion); *United States v. Smith*, 332 F.3d 455, 458 (7th Cir. 2003) (finding *pro se* defendant's pre-sentencing letter to the court sufficiently notified the court and government of objection to guideline application, despite not raising objection at sentencing hearing); *United States v. Sowemimo*, 335 F.3d 567, 573–74 (7th Cir. 2003)

(finding *pro se* defendant "did enough" to raise drug quantity objection at sentencing because district court understood defendant's *pro se* pre-sentencing filings to raise such an objection).

Hart's attempt to recall Detective Motyka and Agent Yoder notified the district court and the government of his objections to the rulings that form the basis of his Sixth Amendment challenge. To be sure, Hart did not mention the Sixth Amendment, the Confrontation Clause, or the Compulsory Process Clause. But the record demonstrates that both the district court and the government understood the Sixth Amendment issues lurking beneath Hart's objections that he now presses on appeal. Thus, we address his arguments on the merits.

A

Hart argues that the district court denied him the opportunity to confront Detective Motyka and Agent Yoder with testimony elicited after his initial cross-examinations. Specifically, Hart asserts that he planned to confront Detective Motyka with evidence that Hart was on both buses the day of the robbery and to confront Agent Yoder with Agent Lovernick's testimony (based on a misunderstood question that Agent Lovernick quickly corrected) that Agent Yoder had boarded the 63rd Street bus.

The Confrontation Clause guarantees a defendant an opportunity to confront witnesses against him, including the right to cross-examine them. U.S. CONST. amend. VI; *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). But the right does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish"—the district

court may impose reasonable limits. *Fensterer*, 474 U.S. at 20. When a district court limits cross-examination, the first question is whether the limitation "directly implicates the Confrontation Clause's core values" triggering *de novo* review. *United State v. Groce*, 891 F.3d 260, 267 (7th Cir. 2018); *United States v. Williamson*, 202 F.3d 974, 978 (7th Cir. 2000). Embedded in that question are two more—what are "core values" under the Confrontation Clause, and when are they "directly" implicated? This court has recognized that, among others, "[e]xposing a witness's motivation, biases, or incentives for lying" and "[i]mpeaching a witness" are core values. *Groce*, 891 F.3d at 267 (quotation omitted). And core values are "directly" implicated when the district court denies a defendant a "reasonable opportunity" to elicit impeaching or discrediting testimony. *United States v. Trent*, 863 F.3d 699, 705 (7th Cir. 2017). We have held that an opportunity is reasonable if the defendant "merely ha[s] the chance to present a motive to lie," *Trent*, 863 F.3d at 705, or to elicit impeachment testimony. *See United States v. Clark*, 657 F.3d 578, 584 (7th Cir. 2011)

But what if a defendant's argument *indirectly* implicates a core value—stated differently, what if the defendant was given a "reasonable opportunity" to impeach or discredit the witness? In that case, "any constitutional concerns vanish" and the court reviews the district court's limitation for abuse of discretion. *Clark*, 657 F.3d at 584. To that end, the district court's discretion to limit cross-examination is "wide," and the limitations may be based on, among other reasons, "harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

Although Hart's argument on appeal implicates core Confrontation Clause values, it does not do so directly; the district court provided Hart ample opportunity to impeach or discredit Detective Motyka and Agent Yoder on cross-examination in the government's case-in-chief. The district court placed no limits on Hart's initial cross-examinations of Detective Motyka and Agent Yoder, allowing Hart to ask questions beyond the scope of direct examination. The district court stressed to Hart during his extensive colloquy concerning recalling witnesses that Hart had asked—and Detective Motyka and Agent Yoder answered—the questions he wished to put to both if recalled.[3] Hart has never explained (at trial or on appeal) how Detective Motyka's answers would have differed if confronted with the fact of Hart's presence on the 63rd Street bus—it made no difference because Detective Motyka had already testified that he did not see Hart on the 63rd Street bus when he briefly boarded it. Hart also has not explained how Agent Yoder's answers would have differed had Hart confronted him with the substance of Agent Lovernick's testimony—Agent Yoder testified that he only boarded the No. 8 bus. Given that Hart's proposed cross-examination would have elicited no new information, his questions are merely "redundant" inquiries that, at most, may have "add[ed] extra detail" which the district court was well within

---

[3] In his reply brief, Hart poses eleven questions that he "could have asked" Detective Motyka and Agent Yoder. None of those questions were raised by Hart when he moved to recall both witnesses. We do not consider the questions for two reasons. First, Hart forfeited the line of questioning by not raising it at trial. *See Burns*, 843 F.3d at 685. Second, our analysis focuses on the district court's decision to limit cross-examination in light of the evidence at trial, not an alternative line of questioning on appeal.

its discretion to refuse. *United States v. Khan*, 508 F.3d 413, 418 (7th Cir. 2007) (citation omitted); *see also Stewart v. Wolfenbarger*, 468 F.3d 338, 348–49 (6th Cir. 2006) (holding that the district court's denial of defendant's request to recall fact witness did not violate the Confrontation Clause because defendant's proposed questions would not elicit new information, and defendant could impeach the fact witness's testimony with that of later witnesses in closing).

B

Hart also argues that the district court's denial of his request to recall Detective Motyka and Agent Yoder violated his Sixth Amendment right to compulsory process.

The Sixth Amendment guarantees a defendant the right to "have compulsory process for obtaining witnesses in his favor." U.S. CONST. amend. VI. Generally, that means a defendant has a right to "offer the testimony of witnesses, and to compel their attendance." *Makiel v. Butler*, 782 F.3d 882, 907 (7th Cir. 2015) (quoting *Washington v. Texas*, 388 U.S. 14, 19 (1967)). However, the right is not unlimited. "[A] defendant's right to compulsory process is abridged only when a court denies the defendant an opportunity to secure the appearance at trial of a witness whose testimony would have been relevant and material to the defense." *Williamson*, 202 F.3d at 979 (quotation and citation omitted). As the Supreme Court has described it, evidence is "material" if a "reasonable likelihood" exists that it "could have affected the judgment of the trier of fact." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873–74; *see Makiel*, 782 F.3d at 908. Evidence that is "merely cumulative to the testimony of available witnesses" does not meet the materiality requirement. *Valenzuela-Bernal*, 458 U.S. at 873.

When reviewing a compulsory process claim that stems from the exclusion of evidence, like in this case, we apply an abuse of discretion standard of review. *See United States v. Hoover*, 246 F.3d 1054, 1061–62 (7th Cir. 2001); *Williamson*, 202 F.3d at 979. The district court did not abuse its discretion when it barred Hart from recalling Detective Motyka and Agent Yoder. As explained above, their testimony would have been cumulative to the testimony already in the record. Additionally, even if their testimony would have been exculpatory (which is doubtful), there is no reasonable likelihood that additional testimony from Detective Motyka or Agent Yoder could have affected the judgment of the jury. The evidence against Hart was overwhelming. Perhaps most significantly, neither witness could help Hart explain to the jury why his fingerprints were left on the demand notes at each bank. Hart failed to explain this evidence at trial, and he has not attempted to do so on appeal.

AFFIRMED